UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 20-61508-CIV-DIMITROULEAS/SNOW

ME TECHNOLOGY, INC., d/b/a CAA USA,

    Plaintiff,

v.

ELLIOT BROWNSTEIN,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Plaintiff's Motion for Determination of Damages filed on October 21, 2020. (ECF No. 50) On October 15, 2020, United States District Court Judge William P. Dimitrouleas referred the issue of damages to United States Magistrate Judge Lurana S. Snow for an evidentiary hearing and a Report and Recommendation. (ECF No. 47) On November 5, 2020, the Court conducted an evidentiary hearing on this Motion. While the Defendant did not file a written response, all parties attended the evidentiary hearing and presented evidence and arguments to the Court. This Motion is now ripe for review.

### I. PROCEDURAL BACKGROUND

CAA USA brought the underlying action for damages and injunctive relief in

connection with Defendant's alleged unauthorized access of CAA USA's social media accounts in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"). (ECF No. 1 at 3)  CAA USA also claimed that Defendant's actions constituted common law conversion, where Defendant deprived CAA USA of use of its valuable intellectual property, the login credentials and the ability to access its social media accounts. (ECF No. 1 at 5-6)  CAA USA alleged, in its Verified Complaint for Damages and Injunctive Relief, that Defendant, a former employee of CAA USA who resigned on July 23, 2020, intentionally used the login credentials for CAA USA's social media accounts to take down the social media pages in order to damage CAA USA's business. (ECF No. 1 at 2–3)  Counts I and III of Plaintiff's Complaint are for injunctive relief, and formed the basis of the Court's Temporary Restraining Order (ECF No. 9) and Preliminary Injunction (ECF No. 17), Counts II and IV of Plaintiff's Complaint are for damages. (ECF No. 1)

On September 28, 2020, following the Clerk's entry of default (ECF No. 40), Plaintiff filed a Motion for Final Default Judgment and Permanent Injunction. (ECF No. 41) On September 29, 2020, the Court entered an Order to Show Cause, requiring Defendant Elliot Brownstein to show cause why Plaintiff ME Technology, Inc. d/b/a CAA USA's Motion for Final Default Judgment and Permanent Injunction (ECF No. 41), should not be granted. (ECF No. 45)  The Court warned that the failure by Defendant Elliot Brownstein to timely respond could result in the Court granting the

Motion for Final Default Judgment and Permanent Injunction. (ECF No. 45 at 2) The Defendant did not file any response to this Court's Order or objection to the Motion.

On October 15, 2020, the Honorable William P. Dimitrouleas entered an Order Granting Plaintiff's Motion For Final Default Judgment and Permanent Injunction and referred the matter to the undersigned for an evidentiary hearing at which CAA USA would have the opportunity to prove the amount of its damages and for a Report and Recommendation. (ECF No. 47 at 2) The undersigned conducted an evidentiary hearing on November 5, 2020, heard argument from CAA USA's counsel and the Defendant Elliot Brownstein ("Defendant"), proceeding pro se, admitted exhibits and heard testimony from various witnesses.

## II. EVIDENCE PRESENTED

At the evidentiary hearing, Michael Hartman ("Hartman"), the CEO of CAA USA, testified that the company's lost Instagram page was essential to the viability of CAA USA's business. Mr. Hartman is considered to be the person with the most knowledge regarding the social media platforms of the company. Hartman testified that having a large Instagram following offered the company credibility and legitimacy and that such a social media presence served as something akin to a business card. Hartman testified that it took CAA USA 3.5 years to build up to 144,000 followers on the original Instagram page and that once the page reached that size, its followers increased naturally without the need for much expenditure. Hartman testified that

3

developing an Instagram page requires a significant investment to grow the page from very few followers to thousands of followers, which creates a perception of respectability in the industry.

Hartman estimated that it would cost CAA USA $145,000 to restore the Instagram page to 144,000 followers. This cost is based on the anticipation that CAA USA will spend $25,000 on employee hours and $120,000 on Instagram influencers to grow their new Instagram page to 144,000 followers. Further, Hartman testified that if CAA USA never had lost their original Instagram page it would be reasonable to assume that CAA USA's Instagram page would have been close to reaching 300,000 followers. Hartman estimated that this lost time and the cost of returning CAA USA to the position they would have been in but-for the loss of their Instagram page is worth an additional $145,000.

Hartman testified that while CAA USA was able to restore access to its Facebook page, CAA USA lost a viral Facebook video which had 29.7 million views. Hartman stated that this video was an extremely valuable marketing tool which generated more than one million dollars in sales. Hartman estimated that this video was worth $100,000, a figure which he stated was conservative and that the true value of the video could be ten times this amount.[1]

Michael Tiraturian ("Tiraturian"), one of the owners of CAA USA, testified

---

[1] Defendant argued that Plaintiff previously had not specifically claimed the loss of the viral Facebook page as an element of damages. However, the Court finds this argument lacks merit since Plaintiff did request damages in its Complaint for losses to all of its social media platforms and "the data contained therein." (ECF No. 1)

regarding the company's increased expenditures after the loss of its Instagram page. The additional expenses which CAA USA incurred was summarized in CAA USA's income statement from July 25, 2020 – October 18, 2020, which was admitted as Plaintiff's Exhibit 3. (ECF No. 52 at 5) Tiraturian testified that CAA USA has spent $217,446.31 on social media, digital media, and video production since the loss of its Instagram page. Tiraturian testified that about 80-85% of this expenditure was attributable to the Instagram page and that it would take a year or four quarters of this spending to return the page to 144,000 followers. Based on Tiraturian's figures, this would result in the expenditure of approximately $696,000 to $739.000 to restore the Instagram page to 144,000 followers.[2]

However, Tiraturian's estimate is at odds with the declaration submitted by Hartman. (ECF No. 50-1) Tiraturian acknowledged that Hartman has the most knowledge of the social media aspects of the company and that Tiraturian's own calculation was based on his estimation. Hartman declared that 50% of the above expenditure would be attributable to the Instagram page, not 80-85% as Tiraturian suggested. Further, the income statement divided expenditures into broad categories and Plaintiff did not present itemized receipts for its expenditures in growing the Instagram site to its current state. Tiraturian was unable to specifically identify the

---

[2] ($217,446.31 x 4) = $869,785.24; ($869,785.24 x .80) = $695,828.19
($217,446.31 x 4) = $869,785.24; ($869,785.24 x .85) = $739,317.45

items or services on which the monies reflected on the income statement were expended. He testified that CAA USA does not keep track of expenditures in a way that would allow them to provide specific amounts spent on rebuilding the Instagram page. Finally, Tiraturian testified, as did Hartman, that it is easier to grow an established Instagram page with a large following because of compound growth. Tiraturian explained that when an Instagram page has many followers, the followers of those followers can see interactions with the Instagram page, a phenomenon which allows for natural growth without the need for additional expenditures. Further, CAA USA is currently a known participant in the industry so rebuilding its Instagram page is distinguishable from a new company entering the market.[3]

Thus, Plaintiff offered two measures of damages at the evidentiary hearing. They are as follows:

1. $145,000 to rebuild the lost Instagram page, an additional $145,000 to make up for the lost year and a half of time spent on rebuilding the Instagram page and returning CAA USA to the place it would have been but-for the loss of the Instagram page. Finally, an additional $100,000 for the loss of the viral Facebook video. This amounts to a total of $390,000.

2. $217,446.31 spent since the loss of the Instagram page, extrapolated out for four quarters. Tiraturian testified that 80-85% of this amount would be spent on rebuilding the Instagram page. This totals approximately $696,000 to $739.000.

---

[3] CAA USA presented evidence that in three months it has regained an Instagram following of over 56,000 followers.

Plaintiff's counsel acknowledged at the evidentiary hearing that the above two measures of damages were being offered to the Court in the alternative.

### III. DISCUSSION

The measure of damages for common law conversion in Florida is "the interest's reasonable market value, measured as of the time and place of conversion" plus interest through the date of final judgment. In re Corbin's Estate, 391 So. 2d 731, 733 (Fla. 3d DCA 1980)  However, in Christopher, the Florida Third District Court of Appeal had to grapple with the question of how to value property that was subject to conversion which had great value to the owner but little value to anyone else. Christopher Advert. Grp., Inc. v. R & B Holding, Co., Inc., 883 So. 2d 867, 871 (Fla. 3d DCA 2004).

The facts of Christopher are similar to those in the instant case. There the plaintiff was an advertising agency which specialized in advertising for automobile dealerships and had devoted half of its time to advertising work for defendant Kendall Toyota. Id. at 869. After forming a successful relationship, the plaintiff and the defendant agreed to have the plaintiff's agency move into the defendant, Kendall Toyota's offices where the plaintiff would continue to complete its work. Id. at 870. Following a dispute between the parties however, the defendant locked the plaintiff out of its offices and refused to allow the plaintiff to retrieve its computers, business

equipment, or advertising materials. Id. The plaintiff testified that it took the agency months to re-create its advertising materials so that it could resume business. Id.

On appeal, the court applied an approach from the Restatement (Second) of Torts, holding that the correct measure of damages for the plaintiff was the cost of re-creating the advertising database. Id. at 872. Thus, the court agreed that the one million dollar verdict obtained at trial should have been set aside because that figure represented plaintiff's attempt at placing a value on the database "as an income-producing asset." Christopher Advert. Grp., Inc., 883 So. 2d at 872 (citing Rest. (2d) of Torts § 911 cmt. e) ("Even when the subject matter has its chief value in its value for use by the injured person, if the thing is replaceable, the damages for its loss are limited to replacement value[.]") The court did hold however, that lost profits which occurred as a result of the conversion also could be recovered if they were demonstrated with sufficient certainty. Christopher Advert. Grp., Inc., 883 So. 2d at 873 (citing Rest. (2d) of Torts § 927(2)(b), (d)); id. § 927 cmt. m.

Under the Computer Fraud and Abuse Act of 1986 an individual "who suffers damage or loss by reason of a violation of this [statute] may maintain a civil action against the violator to obtain compensatory damages[.]" 18 U.S.C. § 1030(g). The Second Circuit has held that lost revenue may only be recovered when it is connected to "an interruption in service." Nexans Wires S.A. v. Sark-USA, Inc., 166 F. App'x. 559, 562 (2d Cir. 2006). However, other federal courts have upheld actions which sought the costs to investigate and take remedial steps in response to a defendant's

misappropriation of data and have not required "an interruption of service" to do so. P.C. Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore, L.L.C., No. 04-4554 (JAG), 2007 WL 708978 at *5 (D.N.J. Mar. 5, 2007) (citing cases); see also Brown Jordan Int'l, Inc v. Carmicle, No. 14-60629-CIV-ROSENBERG, 2015 WL 11660246 at *3-*4 (S.D. Fla. June 3, 2015) (adopting broader definition of loss used by the Second Circuit in Nexans Wires S.A. v. Sark-USA, Inc., 166 F. App'x 559, 562 (2d Cir. 2006)).

The undersigned finds that the proper measure of damages for the loss of the Instagram page is the cost of re-creating the page and restoring it to the place it would have occupied but-for its loss on July 23, 2020. (ECF No. 1 at 2–3)  This finding is based on the factual similarities between this case and Christopher, discussed above, as well as the fact that no party objected to this measure of damages. See Christopher Advert. Grp., Inc., 883 So. 2d at 873.  The undersigned limited CAA USA's evidence and testimony at the evidentiary hearing to the issue of the cost of re-creating the lost Instagram page together with the value if any, of the lost viral Facebook video.  The undersigned permitted evidence pertaining to the cost of producing the original Instagram page only in order to provide context for the cost of re-creating the Instagram page and restoring it to the place it would have occupied but-for its loss on July 23, 2020. (ECF No. 1 at 2–3)

As stated above, CAA USA presented two measures of damages and offered them in the alternative.  The first method ("employee hours method") was based on the cost

9

of the employee hours as well as the cost of Instagram influencers to get the Instagram page back to 144,000 followers and then to get the page to the position it would have been in but-for the loss of the original Instagram page. The second method ("cash expenditures method") was based on an estimation of the amount spent on rebuilding the Instagram page since its loss and then extrapolating this amount outward for a year which was the estimated time required to restore the Instagram page to its original position. (ECF Nos. 50-1 at 11; 50 at 6)

As the above methods were offered in the alternative, and after careful consideration, the Court finds the employee hours method to be the proper measure of damages. Both methods rely heavily on estimates of the future costs that will be incurred to restore the Instagram page. While Florida case law recognizes that damages need not be calculated with exact precision, damages calculations must still be based on adequate data. See Slip-N-Slide Records, Inc. v. TVT Records, LLC, No. 05-21113-CIV, 2007 WL 3232274, at *11-12 (S.D. Fla. 2007) (citing Christopher Advert. Grp., Inc. v. R & B Holding Co. Inc., 883 So. 2d 867, 871 (Fla. 3d DCA 2004)) (law does not contemplate that damages must be calculated with mathematical exactness); but see G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1538 (11th Cir. 1985) (proof of damages may be indirect and based upon assumptions and estimates, as long as the assumptions rest on adequate data). The undersigned finds that the employee hours method of calculating damages is more reasonable because of

the uncertainty involved in the cost and time it will take CAA USA to rebuild their Instagram page to the position it would have been in but-for its loss.

Hartman testified that CAA USA's new Instagram page currently has 56,100 followers. This is a growth of nearly 50,000 followers from the 7,000 followers this new Instagram page had immediately after Brownstein left the company. This growth occurred over a period of about three months. If the Instagram page continued to grow at a linear rate it would reach 144,000 followers in under six months rather than the one year estimated by CAA USA. Both Hartman and Tiraturian testified that larger Instagram pages are easier to grow because of the element of compound growth. Thus, the Court finds that it is reasonable to conclude that the Instagram page will not grow linearly and will instead continue to grow at an exponential rate. Further, the Court recognizes that the risk of uncertainty in calculating damages falls on the wrongdoer. See Slip-N-Slide Records, Inc., 2007 WL 3232274, at *36 (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931)). Based on the foregoing, the undersigned finds that the employee hours method offered by CAA USA is the more appropriate measure of damages in light of all of the factors discussed above.

As for the value of the viral Facebook video, CAA USA offered Hartman's testimony in which he stated that the viral video was worth $100,000 dollars. The undersigned finds that the evidence of loss suffered as a result of CAA USA losing the viral Facebook video is actually a claim for lost profits rather than a loss from an

"income-producing asset." See Christopher Advert. Grp., Inc., 883 So. 2d at 871 (court deciding question of how to value converted property which has great value to the owner but little or no value to anyone else). In Christopher, the court held that a one million dollar verdict properly was set aside by the trial court when this measure of damages was based on the plaintiff's attempt at placing a value on the database "as an income-producing asset." Id. at 872 (citing Rest. (2d) of Torts § 911 cmt. e). In the instant case, as in Christopher Advert. Grp., Inc., the property which was subject to conversion had great value to the owner but little or no value to anyone else. Id. at 871.

CAA USA's viral Facebook video had value to CAA USA because its 29.7 million views offered both credibility for CAA USA's brand and drew customers to purchase their products. Hartman testified that he estimated that the video brought in one million dollars in profits to CAA USA. However, as with the converted database in Christopher, the viral Facebook video in the instant case had value to CAA USA because it advertised its products but it did not necessarily have any reasonable market value to anyone other than CAA USA. See Id. For this reason, the Court finds that the proper measure of damages for the video's loss would have been CAA USA's lost profits which occurred as a result of the video going down. The burden of demonstrating such a loss rests on CAA USA. See Id. at 873 (Lost profits may be recovered, but Plaintiff must demonstrate with sufficient certainty the extent of the loss [ ].); see also Nexans Wires S.A. v. Sark-USA, Inc., 166 F. App'x. 559 at 562

(allowing lost revenue to be recovered under the Computer Fraud and Abuse Act of 1986 when it's connected to "an interruption in service"); Brown Jordan Int'l, Inc v. Carmicle, 2015 WL 11660246 at *3-*4 (adopting broader definition of loss used by the Second Circuit in Nexans Wires S.A. v. Sark-USA, Inc.).

CAA USA did not present any evidence at the evidentiary hearing demonstrating lost profits flowing from the loss of the viral Facebook video, instead CAA USA presented testimony indicating that CAA USA's profits has continued to increase.[4] As CAA USA did not provide evidence of lost profits or demonstrate how a viral video advertising CAA USA's own products would have a reasonable market value of $100,000 to someone other than CAA USA, the Court finds that the lost profits were not established with certainty as required under the law cited above. Therefore, the Court finds that damages should be limited to the cost of restoring the Instagram page and placing CAA USA in the position it would have been in had the loss not occurred.

Accordingly, the undersigned recommends that Plaintiff, CAA USA, should be awarded damages in the amount of $290,000 -- representing $145,000 for the cost of rebuilding the Instagram page and an additional $145,000 to get CAA USA's Instagram page to the position it would have been in but-for its loss on July 23, 2020.

---

[4] CAA USA tried to explain its increase in profits as an increase that has occurred in the market as a whole.

(ECF No. 1 at 2–3) The undersigned believes that this amount will adequately compensate CAA USA because, while it does not compensate CAA USA for the loss of the viral Facebook video, it also does not result in a deduction from damages arising from questions regarding the actual time needed to restore the Instagram page due to compound growth of followers.

### III. CONCLUSION

After carefully reviewing Plaintiff's Motion for Determination of Damages, the entire case file, argument of the parties, the testimony of the witnesses, the evidence presented, and the applicable law, it is hereby respectfully

RECOMMENDED that Plaintiff's Motion be GRANTED so that Plaintiff be awarded damages in the amount of $290,000 against Defendant Elliot Brownstein.

The parties will have fourteen (14) days after being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge. See 28 U.S.C. § 636(b)(1) (providing procedure for review of magistrate judge Report and Recommendation). Failure to timely file objections shall bar the parties from a de novo determination by Judge Dimitrouleas of any issue covered in this Report and shall bar the parties from challenging, on appeal, the factual findings accepted or adopted by this Court, except upon grounds of plain error or manifest injustice. See Thomas v.

Arn, 474 U.S. 140, 145–53 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016)

DONE AND SUBMITTED at Fort Lauderdale, Florida this 13th day of November 2020.

                                          LURANA S. SNOW
                                          UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Honorable William P. Dimitrouleas

All Counsel of Record

Defendant Elliot Brownstein, pro se,
    1189 Lake Victoria Drive Apt.1
      West Palm Beach, FL 33411, USA